**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**BLUEFIELD DIVISION**

| | | |
|---|---|---|
| **RODNEY G. THOMPSON,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 1:12-01551** |
| | ) | |
| **CAROLYN. W. COLVIN,** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| **Defendant.** | ) | |

## PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. By Standing Order entered May 17, 2012 (Document No. 3.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit Proposed Findings of Fact and Recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court is Plaintiff's Motion for Summary Judgment (Document No. 10.) and Defendant's Motion for Judgment on the Pleadings. (Document No. 13.)

The Plaintiff, Rodney G. Thompson (hereinafter referred to as "Claimant"), filed applications for DIB and SSI on February 15, 2008 (protective filing date), alleging disability as of August 30, 2006, due to "learning problems, right arm injury, nerve problems, and status post snake bite with numbness and inability to move fingers on left hand." (Tr. at 16, 114-17, 120-22, 152-53, 157.) The claims were denied initially and upon reconsideration. (Tr. at 61-64, 65-67, 76-78, 79-81.) On January 7, 2009, Claimant requested a hearing before an Administrative Law Judge (ALJ). (Tr. at 82-83.) A hearing was held on March 11, 2010, before the Honorable Joseph T. Scruton. (Tr. at 32-60.) By decision dated April 26, 2010, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 16-31.) The ALJ's decision became the final decision of the Commissioner on March 19, 2012, when the Appeals Council denied Claimant's request for review. (Tr. at 1-5.) Claimant filed the present action seeking judicial

review of the administrative decision on May 17, 2012, pursuant to 42 U.S.C. § 405(g). (Document No. 1.)

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2010). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience.  20 C.F.R. §§ 404.1520(f), 416.920(f) (2010). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir.

1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

> *(c) Rating the degree of functional limitation.* (1)Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
>
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.
>
> (3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.
>
> (4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of

daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).[1] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

---

[1] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation , each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since the alleged onset date, August 30, 2006. (Tr. at 18, Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from "the residual effects of a right foot injury with degenerative joint disease of that ankle and osteopenia, status post laceration to left thigh, status post snake bite to left hand, mild cervical spine degenerative disease, major depressive disorder, generalized anxiety disorder, borderline intellectual functioning, and a history of substance abuse," which were severe impairments. (Tr. at 19, Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 23, Finding No. 4.) The ALJ then found that Claimant had a residual functional capacity to perform sedentary exertional work as follows:

> [C]laimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except that he can lift/carry 10 pounds occasionally and less than 10 pounds frequently; he can stand/walk for a total of slightly less than 2 hours in an 8-hour workday; he can sit for up to 8 hours in an 8-hour workday; he cannot operate foot controls; he can never climb, balance or crouch and only occasionally kneel, crawl and stoop; he can frequently, but not continuously/constantly use his left hand for handling/fingering; he is incapable of following written instructions and carrying out 1-2 step instructions; he is limited to dealing with things rather than people; and he can only have occasional interaction with people.

(Tr. at 26, Finding No. 5.) At step four, the ALJ found that Claimant was unable to return to his past relevant work. (Tr. at 29, Finding No. 6.) On the basis of testimony of a Vocational Expert ("VE") taken at the administrative hearing, the ALJ concluded that Claimant could perform jobs such as a production worker, packer, and laborer/stocker, at the sedentary level of exertion. (Tr. at 30-31, Finding No. 10.) On this basis, benefits were denied. (Tr. at 31, Finding No. 11.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined

as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was born on December 27, 1970, and was 39 years old at the time of the administrative hearing on March 11, 2010. (Tr. at 30, 35, 114, 120.) The ALJ found that Claimant had a high school education and was able to communicate in English. (Tr. at 30, 35, 156, 164-65.) In the past, he worked as a welder. (Tr. at 39, 36, 54, 157-59.)

The Medical Record

The Court has considered all evidence of record, including the medical evidence and will discuss it below in relation to Claimant's arguments.

***Charleston Area Medical Center***:

Claimant was admitted to the hospital on August 31, 2006, having sustained a snake bite to his left middle finger. (Tr. at 250.) He was administered an antivenom, CroFab, to which he apparently developed a reaction and exhibited weakness, nausea, vomiting, faintness, and bradycardia. (Id.) He underwent debridement of the left middle finger and was treated with Lortab and Dilaudid for pain

6

control. (Id.) He was discharged stable to home on September 3, 2006. (Id.)

***Raleigh General Hospital***:

On December 16, 2006, Claimant suffered a 10cm laceration to his left thigh, approximately three inches above the superior border of the patella, when he was working with a circular saw. (Tr. at 281-82.) The orthopedic surgeon advised that there was no bony injury and he underwent irrigation and debridement with closure of the muscle and skin. (Tr. at 294-95.) He tolerated the procedure well. (Tr. at 295.)

***Tug River Health Association, Inc.***:

On August 21, 2007, Claimant complained that he experienced continued pain in the left thigh and felt that the thigh muscles were pulling against each other. (Tr. at 339.) He had decreased sensation. (Id.) On exam, it was noted that his left thigh was hypersensitive and that he was anxious. (Tr. at 338.) He was advised to see the original surgeon for evaluation and possible treatment. (Tr. at 339.) An appointment was made with Dr. Dickinson on September 4, 2007, and he was advised to take Motrin for pain. (Id.)

***Welch Community Hospital***:

Claimant presented to the hospital on May 24, 2006, with complaints of redness and swelling to his jaw and lip after having hit his chin the morning before with a ratchet. (Tr. at 409.) He was diagnosed with facial cellulitis and prescribed daily antibiotic injections. (Tr. at 408.) He returned two days later with complaints of a reaction to the injection, for which he was treated and released. (Tr. at 405-06.)

On October 21, 2006, Claimant complained of pain to his left middle finger, where he had been bitten by a copper head snake, and reported that the pain was severe and radiated up his arm and caused his fingers to feel numb, though he was able to move them. (Tr. at 385.) It was believed that he had a possible allergic reaction to the CroFab, antivenom, for which he was treated. (Tr. at 386-87.)

Claimant presented to the hospital on July 21, 2007, with reports of left shoulder pain after having been hit and knocked down. (Tr. at 359-61.) The x-rays of his shoulder and cervical spine

7

revealed no dislocation or fracture and he was diagnosed with a contusion, for which he was prescribed some medication and discharged. (Tr. at 357-58.)

On September 27, 2007, Claimant presented with reports of having been in an altercation the night before where he was kicked in the head and back multiple times. (Tr. at 349.) He suffered a three quarter inch laceration to the left side of his head at the hair line and had multiple reddish knots to the right side of his head behind his right ear. (Id.) He had an abrasion type area at his mid-back area and swelling was noted of his left wrist. (Id.) He had full range of motion of all extremities and had strong hand grip. (Id.) A wrist splint was applied and he reported relief with pain medication. (Id.) Claimant was instructed to follow up with his primary care physician. (Id.) He was prescribed Motrin 400mg and given a work excuse for September 28, 2007. (Tr. at 345-46.)

***Bluewell Family Clinic***:

Claimant treated at the Clinic from February 23, 2007, through March 4, 2008. (Tr. at 417-28.) Claimant was examined by Nurse Practitioner Ameneh Sloane, F.N.P., on February 23, 2007, status-post left thigh laceration, at which time he reported having fallen recently and noticed increased pain in the leg. (Tr. at 425.) He exhibited full range of motion and a steady gait. (Id.) He was prescribed Wygesic every six hours and Flexeril, and was instructed to follow-up with Dr. Cross. (Id.) He was further instructed to apply moist heat to the thigh and a six inch Ace wrap was applied to the thigh. (Id.) He was given a Toradol 60 and Decadron 8mg  injection. (Id.)

Claimant returned to the Clinic on January 21, 2008, with a request for a CT scan of his head. (Tr. at 423.) He explained to Nurse Practitioner Nancy Davidson, F.N.P., that he had been hit in the head with a bottle of Texas Pete hot sauce, and reported blurred vision and headaches that kept him from sleeping. (Id.) He also reported left shoulder pain, neck pain, and left back pain, for which he was under the care of Dr. Carson before he retired. (Id.) On exam, Claimant had pain when turning his head from side to side and when flexing and hyperextending his neck. (Id.) He had full range of motion of his extremities, though he had tenderness with palpation and range of motion to the left shoulder. (Id.) He

8

was assessed with headache secondary to trauma and blurred vision. (Tr. at 424.) He was prescribed Naprosyn 500 and Flexeril 10mg, and x-rays were ordered. (Id.)

Claimant reported to Nurse Practitioner Sloane continued neck pain on January 29, 2008. (Tr. at 420.) Cervical spine x-rays revealed a small anterior osteophyte at C5. (Tr. at 420, 422.) Examination revealed mild tenderness to palpation of the cervical spine but the remainder of the exam was unremarkable. (Tr. at 420.) He was assessed with an osteophyte at C6, chronic neck pain, and cervical muscle spasms, for which he was prescribed a Medrol Dosepak, Robaxin 750, Ultram 50, Voltaren 75, and a Toradol 60mg injection. (Id.) On March 4, 2008, Claimant reported to Nurse Practitioner Sloane persistent headache, neck pain, and an inability to sleep. (Tr. at 417.) He had some relief with the medications, but the symptoms were starting to reoccur. (Id.) He was prescribed Dolobid 250, Flexeril 10mg, and Ultram 50mg and was instructed to follow-up with Dr. Greenberg, a neurosurgeon. (Id.)

### *Jeffrey A. Greenberg, M.D.*:

Claimant underwent a neurological consultation at the request of Dr. Carol Asbury from Bluewell Family Clinic on April 1, 2008. (Tr. at 431-33.) Claimant reported chronic neck pain that began four years prior when he fell out of a tree, that was exacerbated when he turned his head side to side. (Tr. at 431.) Claimant reported that he took Flexeril and Tramadol as needed for pain. (Id.) On examination, Dr. Greenberg noted that Claimant was oriented and had an appropriate and normal affect. (Id.) Straight leg raising testing was negative; motor, sensory, and reflexes were normal, though at times, he had "inconsistent give-way of interosseous muscles of hands;" Claimant had a normal gait and tandem walk, and could toe and heel walk without difficulty, bilaterally; he had normal cervical and lumbar range of motion; and he exhibited no tenderness to percussion. (Tr. at 432.) Dr. Greenberg noted that the x-rays of the cervical spine were relatively benign and therefore, recommended a MRI of the cervical spine. (Id.)

### *Bluewell Family Clinic*:

Claimant returned to the Clinic on April 11, 2008, and reported to Ms. Cathy Hamblin that he

continued to have left leg pain from the laceration. (Tr. at 434-36.) He explained the pain as a drawing and pulling sensation to the muscles with some twitching at times with numbness and some radiation to the knee. (Tr. at 434.) He stated that he could not stand or walk for long periods of time. (Id.) He also reported continued neck pain. (Id.) On examination, Ms. Hamblin noted that Claimant was hypersensitive even with light palpation to the left thigh and that he jerked back with the lightest touch and would not allow a full deep palpation exam. (Tr. at 435.) She assessed chronic muscular pain, left thigh, status post laceration repair to December 2006; Osteophyte C6; Cervical syndrome; and history of recreational drug and alcohol abuse, for which she prescribed Flexeril 10mg, Dolobid 250mg, and Ultram 50mg. (Id.) Claimant was instructed to follow-up with Dr. Dickinson who did the laceration repair and with Dr. Greenberg for the neck pain. (Id.)

***Uma Reddy, M.D.***:

On August 6, 2008, Dr. Reddy, a state agency reviewing physician, completed a form Physical RFC Assessment, on which she opined that Claimant's  impairments were non-severe. (Tr. at 474-81.) Dr. Reddy indicated that Claimant's limitations on his activities seemed disproportionate to the actual physical findings. (Tr. at 479.)

***Dr. Carol Asbury, M.D.***:

On October 21, 2008, Dr. Carol Asbury, M.D., completed a form Medical Source Statement of Ability to Do Work-Related Activities (Physical), on which she opined that Claimant was capable of lifting or carrying ten pounds occasionally and less than ten pounds frequently due to limited grip strength in his left hand. (Tr. at 542-46.) She assessed that Claimant could stand or walk less than two hours in an eight-hour workday, sit about six hours in an eight-hour workday, and had limited pushing and pulling ability in his lower extremities. (Tr. at 542-43.) Dr. Asbury explained that Claimant suffered a severe fracture to his right foot in 1984, which was followed by chronic pain since then that left him unable to stand for long periods of time. (Tr. at 543.) In 2006, Claimant suffered a severe laceration to the quadriceps muscle of his left thigh, which leg he used to use to compensate for the right foot pain.

(Id.) Claimant reported that he was able to stand for only 30 to 40 minutes at a time. (Id.) Finally, in 2006, Claimant suffered a snake bite to his left hand, that left him with weakness and no grip strength in that hand. (Id.)

Dr. Asbury further assessed postural limitations of occasionally kneeling, crawling, and stooping, and never climbing, balancing, or crouching. (Tr. at 543.) She explained that Claimant has muscle wasting of the left thigh quadriceps and limited range of motion of the right foot and ankle. (Id.)Dr. Asbury opined that Claimant's ability to handle, finger, and feel with the left hand was limited by his impairments and that he could occasionally perform these functions with the left hand but could perform all functions with the right hand. (Tr. at 544.) She explained that these limitations were due to the weakness that resulted from the snake bite to the left hand. (Id.) Claimant reported diminished visual acuity, though he had not had a recent eye exam, and therefore, Dr. Asbury opined that his ability to see was limited. (Tr. at 544.) Finally, Dr. Asbury opined that Claimant should avoid noise, humidity, and wetness. (Tr. at 545.) She noted that he also had an anxiety disorder. (Id.)

On a form Clinical Assessment of Pain, dated October 2, 2008, Dr. Asbury noted that Claimant's pain was present and found to be incapacitating, that physical activity greatly increased the pain and caused abandonment of tasks related to daily activities or work, and that medication impacts Claimant's work ability to the extent that he is restricted from the work place and is unable to function at a productive level. (Tr. at 546.)

***Dr. Amy Wirts, M.D.***:

On October 30, 2008, Dr. Wirts, a state agency reviewing physician, completed a form Physical RFC Assessment, on which she opined that Claimant's impairments limited him to performing medium exertional level work. (Tr. at 547-54.) She opined that he could occasionally climb, balance, and crawl and could frequently stoop, kneel, and crouch. (Tr. at 549.) Dr. Wirts further opined that Claimant should avoid concentrated exposure to cold, vibration, and hazards. (Tr. at 551.) She also opined that his impairments did not meet listing level severity. (Tr. at 553.)

**_Dr. Lenord S. Horwitz, DPM_**:

Claimant treated with Dr. Horwitz on November 12, 2008, for complaints of right foot and muscle pain. (Tr. at 555-60.) He reported that the pain was worse in his toes and that he had to wear two pairs of socks for cushioning. (Tr. at 555.) Claimant thought that the pain started a year ago. (Id.) He rated the pain as severe between a level seven and ten out of ten, and that it was worse when he walked. (Id.) He also reported that the pain radiated into the right leg. (Id.) Physical examination revealed diminished to absent prick and light touch sensations and possible Tinel's sign. (Tr. at 556.) Dr. Horwitz was able to reproduce tingling and shooting pain that followed the course of the nerve, which may have been a positive Tinel's sign. (Id.) The right ankle was found to be unstable and mobilization of the right ankle's range of motion revealed decreased dorsi flexion and increased inversion, with otherwise normal range of motion. (Id.)

Dr. Horwitz assessed osteoarthrosis, degenerative joint disease of the right ankle and foot; ASO with Claudication; foot pain; and late effects of work accident. (Tr. at 557.) There was a differential diagnosis of fracture of the first metartarsal. (Id.) Dr. Horwitz ordered a CT scan of the right bunion with contrast and prescribed and fitted him with a removable pneumatic insole, a prefabricated orthosis, fitted to Claimant's right leg and ankle. (Id.) He further prescribed Celebrex 200mg. (Tr. at 558.)

**_Bluefield Regional Medical Center_**:

Claimant presented to the hospital on November 22, 2009, with a gunshot wound to his back. (Tr. at 612-20.) He was treated at the hospital from November 22, 2009, through December 28, 2009. (Tr. at 583-620.) He was treated at the West Virginia Vascular Treatment by Dr. Herbert Oye, for his gunshot wound, where it was cleaned with saline and Lidocaine was applied. (Tr. at 579-82.) Dr. Oye prescribed Lortab 7.5/500mg every four to six hours for pain as needed. (Id.)

Claimant's Challenges to the Commissioner's Decision

Claimant first alleges that the Commissioner's decision is not supported by substantial evidence because the Appeals Council erred in declining to take action upon the additional evidence submitted

on appeal. (Document No. 11 at 6-7.) Claimant asserts that the treatment records from Dr. Horwitz, his treating podiatrist, and Dr. Horwitz's Medical Source Statement, conflicted with the ALJ's assessed RFC. (Id.) Claimant asserts that the Appeals Council's determination, therefore, that the additional evidence did not affect the ALJ's decision clearly is wrong. (Id. at 7.) He asserts that the determination of such evidence "is a function of and for the [ALJ], and in light of the clear conflict created by this evidence, supported by a significant treatment history, it was incumbent upon the Appeals Council to remand [Claimant's] case to the [ALJ] for consideration of this additional evidence." (Id.)

In response, the Commissioner asserts that contrary to Claimant's assertion, there was no basis to conclude that the additional documents would have changed the ALJ's decision. (Document No. 13 at 12-14.) The Commissioner contends that the additional documents neither were new nor material. (Id. at 13-14.) Dr. Horwitz's treatment notes from December 2008, through April 2010, were not new because they were in existence and available to Claimant prior to the issuance of the ALJ's decision. (Id. at 13.) Furthermore, the medical records contained duplicative and cumulative evidence regarding Claimant's foot and ankle pain, and revealed generally unremarkable physical examinations. (Id.) The additional evidence was not material because Claimant failed to establish that the documents would have changed the ALJ's decision. (Id. at 13-14.) The Commissioner asserts that the ALJ considered a Medical Source Statement from Dr. Asbury, which contained restrictive findings similar to those of Dr. Horwitz. (Id. at 14.) Dr. Horwitz did not reveal any additional limitations that were not considered by the ALJ, and therefore, the additional evidence would not have changed the ALJ's decision. (Id.) Accordingly, the Commissioner contends that the additional evidence does not warrant remand because it is neither new nor material. (Id.)

Claimant next alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ failed to give appropriate weight to the opinion of his treating physician, Dr. Asbury.

(Document No. 11 at 7-9.) Claimant notes that the ALJ discounted Dr. Asbury's opinion because she was a family practitioner as opposed to a specialist, and because her medical records failed to document ongoing treatment for the left hand residuals of a snake bite. (Id. at 7-8.) The ALJ further discounted her opinion because the residual effects of Claimant's right foot and ankle fractures and left thigh lacerations were accommodated with his sedentary RFC. (Id. at 8.) Claimant asserts, however, that the ALJ failed to provide any reasoning for discounting Dr. Asbury's clinical assessment of pain and her opinions. (Id.) Claimant further asserts that Dr. Horwitz's opinion, which was submitted to the Appeals Council, supports Dr. Asbury's opinion. (Id.) Accordingly, Claimant contends that the ALJ acknowledges significant physical limitation, but refused to acknowledge significant pain that could have accompanied such physical limitations and failed to provide any substantive reasoning for finding that Dr. Asbury's opinions were not supported by the record. (Id. at 9-10.)

In response, the Commissioner asserts that Claimant impermissibly is asking the Court to re-weigh the evidence to reach a different result that is favorable to him. (Document No. 13 at 14.) The Commissioner further asserts that decisions as to whether a claimant is disabled are reserved to the Commissioner and that controlling weight cannot be given to such opinions on issues reserved to the Commissioner. (Id. at 15.) The Commissioner contends that the ALJ properly accorded Dr. Asbury's opinion moderate weight as it was not supported by the relevant evidence. (Id. at 16.) The record failed to evidence ongoing treatment for the snake bite injury and Dr. Greenberg found only inconsistent give-way of the muscles of Claimant's hands. (Id.) Treatment notes were minimal and reflected Claimant's subjective complaints. (Id.) The Commissioner notes Dr. Asbury was not a specialist and that the record failed to demonstrate that Dr. Asbury examined or evaluated Claimant herself. (Id. at 17.) The Commissioner contends therefore, that the ALJ was entitled to give marginal weight to the check-mark form completed by Dr. Asbury, which was inconsistent with the medical evidence, including her

14

relatively benign treatment records. (Id.)

Finally, Claimant alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ failed to provide any "meaningful examination of the side effects" of his medications. (Document No. 11 at 9-10.) He asserts that he testified as to the cloudy effect from the Seroquel he was provided, and that he experienced drowsiness from his medications. (Id. at 9.) He further asserts that Dr. Asbury recognized the effects of his medications and restricted him from the workplace when on certain medications. (Id.) The ALJ, however, Claimant asserts, referenced Claimant's testimony as to the medication side effects, but failed to provide any analysis of the effects to which he testified. (Id.) Accordingly, Claimant requests that the matter be remanded to address the issue of the side effects of his prescribed medications. (Id. at 10.)

In response, the Commissioner asserts, that Claimant's medical providers failed to document ongoing complaints of side effects and notes that Claimant points only to two documents that mention the possibility of any side effects. (Document No. 13 at 18-19.) These documents were the Clinical Assessments of Pain completed by Dr. Asbury and Dr. Horwitz. (Id. at 18.) The Commissioner asserts however, that these documents are unsupported by any treatment records. (Id.) Consequently, the record contained no credible medical evidence that Claimant experienced any significant or disabling limitations resulting from his medications, and the Commissioner contends that the ALJ appropriately determined that no additional limitations were necessary. (Id.)

Analysis.

1. Evidence Submitted to the Appeals Council.

Claimant first alleges that the Appeals Council failed to address appropriately the additional evidence submitted by Claimant. (Document No. 11 at 6-7.) In deciding whether to grant review, the Appeals Council "must consider evidence submitted with the request for review . . . 'if the additional evidence is (a) new, (b) material, and (c) relates to the period on or before the date of the ALJ's

decision.'" <u>Wilkins v. Secretary</u>, 953 F.2d 93, 95-96 (4th Cir. 1991)(*en banc*)(citations omitted). Evidence is "new" if it is not duplicative or cumulative. <u>See id.</u> at 96. "Evidence is material if there is a reasonable possibility that the new evidence would have changed the outcome." <u>Id.</u>

Following the ALJ's decision, Claimant submitted to the Appeals Council for the first time, records from Dr. Tahir I. Rana, M.D., dated May 2010; Foot Pain Associates (Dr. Horwitz), dated January 8, 2009, through June 3, 2010; Bluewell Family Clinic (Dr. Asbury), dated November 30, 2009; Dr. Riaz U. Riaz, M.D., dated June 21, 2010; and West Virginia Vascular Institute, dated February 8, 2010, through January 25, 2011.[2] (Tr. at 5, 636-44, 645-71, 772-76, 777-83, 784-99.) Claimant focuses on only the records from Dr. Horwitz. (Document No. 11 at 6-7.) Though he acknowledges the medical records from December 2008 through April 2010, Claimant particularly focuses on Dr. Horwitz's Medical Source Statement of Ability to Do Work-Related Activities (Physical), dated June 2, 2010, and asserts that such opinion calls into question the ALJ's RFC assessment. (<u>Id.</u> at 7.)

The records from Dr. Horwitz consist of a Medical Source Statement of Ability to Do Work-Related Activities (Physical), dated June 2, 2010 (Tr. at 647-52.), and treatment notes from January 8, 2009, through June 3, 2010. (Tr. at 655-70.) The Appeals Council stated in its Notice of Action that it considered the additional evidence of Dr. Horwitz and determined that it did not provide a basis for changing the ALJ's decision. (Tr. at 1-2.)

The Commissioner asserts that the medical records from December 2008 through April 2010, are not new because they were in existence and available to Claimant prior to the issuance of the ALJ's

---

[2] The Appeals Council determined that the additional evidence from the Beckley Pain Clinic, Community Radiology, West Virginia Vascular Institute, Dr. Riaz, Dr. Rana, and the Clinical Assessment dated April 1, 2011, from an unknown source, reflected information beyond the ALJ's decision, and therefore, did not affect the ALJ's decision as to whether Claimant was disabled on or before April 26, 2010. (Tr. at 2.) The Appeals Council did consider the medical records of Dr. Rana dated May 2010, Dr. Horwitz, Bluewell Family Clinic dated November 2009, and the West Virginia Vascular Institute dated February 2010 through May 2010, and determined that the evidence did not provide a basis for changing the ALJ's decision. (Tr. at 1-5.) Claimant limits his argument to the evidence submitted by Dr. Horwitz, and therefore, the undersigned limits his review to that evidence.

16

decision. (Document No. 13 at 13.) The undersigned agrees with the Commissioner that the medical records through April 12, 2010, pre-date the ALJ's decision and that Claimant failed to demonstrate why he was unable to produce the records prior to the ALJ's decision. The actual treatment records were not a part of the administrative record however, and the Appeals Council could have considered them as "new." It is clear though that the Appeals Council properly determined that the records were not material. Dr. Horwitz's treatment records in their entirety essentially reiterate the same subjective complaints of Claimant, with some variance of worsening of symptoms, and essentially the same unremarkable findings and treatment. Dr. Horwitz even stated on at least two occasions that Claimant "continues to have the same physical findings and symptomatology as in previous visits." (Tr. at 740, 768.) The treatment records therefore, failed to provide any substantive value in addition to the single treatment record that was submitted to the ALJ. If anything, the treatment records showed consistency, but did not provide any support that would have caused the ALJ to have changed his decision.

Likewise, Dr. Horwitz's opinion was not material to the ALJ's decision. Dr. Horwitz opined that Claimant could lift and carry ten pounds occasionally and frequently, could stand or walk less than two hours in an eight-hour day, could sit less than six hours in an eight-hour day, and was limited in performing pushing and pulling activities in his lower extremities. (Tr. at 647-50.) He opined that Claimant could occasionally climb but should never balance, kneel, crouch, crawl, and stoop. (Tr. at 648.) He further opined that Claimant should avoid temperature extremes, humidity and wetness, and hazards. (Tr. at 650.) Dr. Horwitz also completed a form Clinical Assessment of Pain, dated June 2, 2010, on which he indicated that Claimant had incapacitating pain that was greatly increased with physical activity such that he abandoned tasks related to daily activities or work, and that medication impacted Claimant's work ability to the extent that he was restricted from the work place and was unable to function at a productive level. (Tr. at 651.)

As the Commissioner notes, Dr. Horwitz's opinion essentially is the same opinion as Dr. Asbury, which as will be discussed below, the ALJ accorded moderate weight. Though Dr. Horwitz, too, was a

17

treating physician, there is nothing to suggest that his opinion would have changed the ALJ's decision. The additional treatment notes essentially were the same as the sole treatment note from Dr. Horwitz dated November 12, 2008, that was considered by the ALJ, though increased in number. Without additional substantive value however, the undersigned does not find that the treatment notes and resulting opinion of Dr. Horwitz would have changed the ALJ's opinion, and therefore, that the Appeals Council did not err in addressing this additional evidence.

2. <u>Opinion Evidence</u>.

Claimant next alleges that the ALJ erred in discounting the opinion of his treating physician, Dr. Asbury. (Document No. 11 at 7-9.) Every medical opinion received by the ALJ must be considered in accordance with the factors set forth in 20 C.F.R. §§ 404.1527(d) and 416.927(d) (2010). These factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) various other factors. Additionally, the Regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." <u>Id.</u> §§ 404.1527(d)(2) and 416.927(d)(2).

Under §§ 404.1527(d)(1) and 416.927(d)(1), more weight is given to an examiner than to a non-examiner. Sections 404.1527(d)(2) and 416.927(d)(2) provide that more weight will be given to treating sources than to examining sources (and, of course, than to non-examining sources). Sections 404.1527(d)(2)(I) and 416.927(d)(2)(I) state that the longer a treating source treats a claimant, the more weight the source's opinion will be given. Under §§ 404.1527(d)(2)(ii) and 416.927(d)(2)(ii), the more knowledge a treating source has about a claimant's impairment, the more weight will be given to the source's opinion. Sections 404.1527(d)(3), (4) and (5) and 416.927(d)(3), (4), and (5) add the factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more consistent an opinion is with the

evidence as a whole, the more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty). Unless the ALJ gives controlling weight to a treating source's opinion, the ALJ must explain in the decision the weight given to the opinions of state agency medical or psychological consultants. 20 C.F.R. §§ 404.1527(f)(2)(ii) and 416.927(f)(2)(ii) (2010). The ALJ, however, is not bound by any findings made by state agency medical or psychological consultants and the ultimate determination of disability is reserved to the ALJ. Id. §§ 404.1527(f)(2)(I) and 416.927(f)(2)(I).

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2010). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2010). The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2010). Ultimately, it is the responsibility of the Commissioner, not the court to review the case, make findings of fact, and resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the Court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527 and 416.927(d)(2)-(6).

In the instant matter, the ALJ gave moderate weight to the opinion of Dr. Asbury, Claimant's

treating physician because (1) she is a family practitioner rather than a specialist, (2) the medical records failed to document any ongoing treatment or attention given to the left hand for residual effects from the snake bite and Dr. Greenberg concluded that he had only inconsistent give-way of the interosseous muscles of the hands, and (3) the well-documented residual effects from the right foot and right ankle fractures and left thigh laceration were accommodated with the sedentary RFC. (Tr. at 29.) In sum, the ALJ concluded that Dr. Asbury provided routine and conservative care to Claimant. (Id.)

The ALJ appropriately noted that Dr. Asbury was a family practitioner rather than a specialist, and pointed out that Dr. Asbury referred Claimant to a specialist, Dr. Greenberg, who determined that Claimant had "at times inconsistent give-way of [the] interosseous muscles of [his] hands." (Tr. at 29, 432.) Dr. Asbury may have been a treating physician, though the record did not indicate that she physically examined Claimant, rather the nurse practitioners did, but Dr. Greenberg was a specialist in neurology. As the ALJ found, the medical record did not reflect any ongoing treatment or attention for the residual effects from the snake bite on his hand, except for when he had the possible reaction to the antivenom. Furthermore, as the ALJ found, the residual effects from his right foot and ankle fractures and left thigh laceration were accommodated with the sedentary RFC. Dr. Greenberg's notes revealed that despite the leg pain, Claimant was able to ambulate without difficulty and had normal range of motion. (Tr. at 431-32.) Treatment notes from Bluewell Family Clinic revealed some twitching and pulling sensation of the leg muscles and some hypersensitivity. (Tr. at 434-36.) The same was found at Tug River Health Association. (Tr. at 339.) Dr. Horwitz's exam revealed some decreased range of ankle motion and possible Tinel's sign with some limping, but the exam otherwise was normal. (Tr. at 556.) The record was void of stringent limitations within the medical records. Accordingly, the undersigned finds that the ALJ properly considered Dr. Asbury's opinion and accounted for leg, foot, and ankle limitations in the sedentary RFC. The ALJ's assessment of Dr. Asbury's opinion therefore, is supported by the substantial evidence of record.

3. <u>Medication Side Effects</u>.

Claimant finally alleges that the ALJ erred in failing to consider the side effects of his medications. (Document No. 11 at 9-10.) In assessing a claimant's credibility, the Commissioner must consider "[t]he type, dosage, effectiveness, and side effects of any medication" a claimant takes to alleviate her pain or other symptoms. <u>See</u> 20 C.F.R. §§ 404.1529(c)(3)(iv) and 416.929(c)(3)(iv) (2010). In his decision, the ALJ specifically noted Claimant's testimony that Seroquel kept him "clouded up," and that other medications caused drowsiness and sleepiness. (Tr. at 27, 49.) The ALJ also noted that on a form Clinical Assessment of Pain, Dr. Asbury noted that medication impacted Claimant's ability to work to the extent that he was restricted from the work place and was unable to function at a productive level. (Tr at 22, 29, 546.) As discussed above, the ALJ accorded Dr. Asbury's opinion only moderate weight, and he determined that Claimant was not entirely credible. (Tr. at 28-29.)

Claimant contends that the ALJ provided "no meaningful explanation of the side effects" of his medications. (Document No. 11 at 9-10.) He asserts that the only reference to any functional impact of the medication side effects was the restriction of running heavy equipment and avoiding people while on medication. (<u>Id.</u> at 10.) Claimant asserts that this did not constitute an analysis of the side effects of the medication. (<u>Id.</u>) Claimant asserts that both Drs. Asbury and Horwitz recognized the medication side effects in their assessments. (<u>Id.</u> at 9-10.) The Commissioner asserts that the medical evidence fails establish the existence of any significant limitations resulting from medications, and therefore, the ALJ was not required to find any additional limitations in the RFC assessment. (Document No. 13 at 18-19.)

The undersigned finds the Commissioner's argument persuasive. The medical evidence fails to demonstrate any significant, if any at all, side effects from Claimant's medications. Though Drs. Asbury and Horwitz indicated that medication impacted Claimant's ability to work, such assessment

21

was on a form questionnaire and neither the medications, nor side effects or limitations were identified. Their assessment was not supported by their treatment notes. Though medications were prescribed, their notes did not reveal any subjective complaints from Claimant or any warnings from the physician regarding possible side effects from the medications. Claimant testified that he experienced sleepiness, drowsiness, and a cloudy effect from his medications. The ALJ considered such statements in assessing Claimant's credibility. In the absence of medical evidence supporting such limitations, the undersigned finds that the ALJ was not required to incorporate any further limitations in his RFC assessment. See Johnson v. Barnhart, 434 F.3d 650, 658 (4th Cir. 2005) ("Drowsiness often accompanies the taking of medication, and it should not be viewed as disabling unless the record references serious functional limitations.")(quoting Burns v. Barnhart, 312 F.3d 113, 131 (3d Cir. 2002)). Accordingly, the undersigned finds that the ALJ's analysis of Claimant's alleged side effects is supported by the substantial evidence of record.

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Plaintiff's Motion for Summary Judgment (Document No. 10.), **GRANT** the Defendant's Motion for Judgment on the Pleadings (Document No. 13.), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable David A. Faber, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(e) and 72(b), Federal Rules of Civil Procedure, the parties shall have three days (mailing/service) and then fourteen days (filing of objections) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time

22

period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155, 106 S.Ct. 466, 475, 88 L.Ed.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Faber, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to send a copy of the same to counsel of record.

Date: July 3, 2013.

R. Clarke VanDervort
United States Magistrate Judge